IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| BETTYLOU ALLEN, | ) | Civil Action No. 3:11-2427-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, Bettylou Allen, filed this action on September 12, 2011. By Order of Reference (Doc. 17) from the Honorable J. Michelle Childs, United States District Judge, pursuant to 28 U.S.C. § 636, Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, and the consent of the parties, the case is before the undersigned Magistrate Judge for a final order. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

## **ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for DIB and SSI on September 22, 2008, alleging disability as of April 17, 2007. Plaintiff's applications were denied initially and on reconsideration. Plaintiff then requested a hearing before an administrative law judge ("ALJ"). A hearing was held on October 19, 2010, at which Plaintiff appeared and testified. On October 29, 2010, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled. The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff can do.



Plaintiff was thirty-six years old at the time of the ALJ's decision. She completed the eleventh grade, and later obtained a GED. Tr. 33. She alleges disability due to ischemic heart disease, status post pacemaker implantation, history of aortic prosthetic valve placement, degenerative disc disease, and hypercoagulabilty. See Tr. 12, 192, 243.

The ALJ found (Tr. 12-18):

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since April 17, 2007, the alleged onset date (20 CFR 404.1571, *et seq.,* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: ischemic heart disease, status post pacemaker implantation, history of aortic prosthetic valve placement, degenerative disc disease and hypercoagulabilty secondary to Coumadin/Warfarin treatment (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the criteria of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity for performing work with restrictions that require no lifting or carrying over 10 pounds occasionally and less than 10 pounds frequently; no standing or walking over two hours in an 8-hour workday; only occasional stooping, twisting, balancing, crouching, kneeling, and climbing of stairs or ramps; no crawling or climbing of ladders or scaffolds; avoidance of hazards such as unprotected heights and dangerous machinery; and an environment reasonably free from dust, fumes, gases, odors or extremes of temperature and humidity.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 10, 1974 and was 33 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).



8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 17, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On July 28, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. Plaintiff filed this action in the United States District Court on September 12, 2011.

**STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).



**MEDICAL EVIDENCE**

On June 26, 2008, Plaintiff was treated by Dr. Ugo Okereke for complaints of a pinched nerve, back pain, diabetes, and hypertension. Dr. Okereke diagnosed Plaintiff with diabetes mellitus with neurological manifestations, peripheral neuropathy, suspected glaucoma, hypertensive heart disease, asthma, pain in her right shoulder and elbow, back pain, heart palpitations, and murmur. He prescribed medications for her impairments. Tr. 331-333.

On August 15, 2008, Plaintiff was hospitalized for testing as to her heart murmur. An echocardiogram revealed she had an enlarged aortic root with severe aortic insufficiency. Cardiac catheterization revealed normal coronary arteries, but a dilated aneurysmal ascending aortic root. On August 20, 2008, Plaintiff underwent aortic root replacement using a mechanical aortic valve. She had postoperative complications, including bradycardia and a heart block. Based on these complications, Plaintiff underwent permanent pacemaker implantation on August 28, 2008. Plaintiff was prescribed Coumadin (an anticoagulant) because of her mechanical valve. She was discharged on September 2, 2008. See Tr. 259-313.

Dr. Reid Tribble examined Plaintiff on September 2, 2008. He noted she would require insulin until such time as her stress from surgery dissipated and that it was mandatory for her to have some type of prospective birth control strategy. Tr. 393-394. On September 3, 2008, Dr. Okereke diagnosed coagulopathy and controlled hypertensive heart disease without congestive heart failure. He prescribed medications. Tr. 334-336. Dr. Okereke described Plaintiff's coagulopathy as stable and her hypertensive heart disease as controlled, and prescribed Warfarin (an anticoagulant) on September 5 and 10, 2008. Tr. 337-339.



On September 11, 2008, Plaintiff began treatment with Dr. M. Francisco Gonzalez, a hematologist. Dr. Gonzalez noted that Plaintiff was taking Warfarin and her prothombin time was therapeutic. Examination revealed that Plaintiff had regular heart sounds and no extremity edema. Dr. Gonzalez diagnosed status post-aortic valve replacement and prescribed continued Warfarin therapy. Tr. 517-518. On September 15, 2008, Plaintiff reported to Dr. Tribble that she was well, and he indicated that she had excellent progress following her surgery. Tr. 392. Dr. Okereke diagnosed Plaintiff with improving diabetes mellitus, and controlled coagulopathy on September 17, 2008. He provided counseling and prescribed Lantus (insulin) and Warfarin. Tr. 340-341. He diagnosed stable coagulopathy and prescribed Warfarin on September 24, 2008. Tr. 342-343. On September 26, 2008, Plaintiff underwent an echocardiogram, which showed mild tricuspid and mitral valve insufficiency and a competent aortic valve. Tr. 378.

Plaintiff complained to Dr. Okereke about leg swelling and shortness of breath on October 9, 2008. He diagnosed swelling of her limb, shortness of breath, urinary frequency, improving diabetes mellitus, and stable coagulopathy. Tr. 368-370. On October 17, 2008, Dr. Gonzalez increased Plaintiff's Warfarin dosage. Tr. 516. An ultrasound of Plaintiff's abdominal aorta showed no evidence of aneurysmal dilation on October 22, 2008. Tr. 379.

On October 31, 2008, Dr. Okereke diagnosed Plaintiff with chest pain and contusion on the right and prescribed medication. Tr. 371-373. On November 12, 2008, a chest CT scan revealed post surgical changes in Plaintiff's mediastinum with right lung atelectasis, but no aortic abnormalities. Tr. 385.

Dr. Okereke diagnosed amenorrhea, myalgia, nausea, unstable diabetes, and stable coagulopathy on January 27, 2009. Tr. 374-376. Plaintiff was hospitalized on February 5, 2009, at



which time it was noted she became pregnant two weeks previously. Dr. Gonzalez recommended anticoagulant therapy with Heparin instead of Warfarin (which appears to be based on her pregnancy). Physical examination was essentially unremarkable. Plaintiff was discharged on February 7, 2009, at which time her Heparin levels were therapeutic. Tr. 441-442, 444-445, 480-482.

On February 9, 2009, Dr. Tribble diagnosed pregnancy and mechanical valve with Heparin therapy. Tr. 387. The same day, Dr. Okereke diagnosed Plaintiff with unstable diabetes and unchanged coagulopathy. Medications were prescribed. Tr. 483-485.

On February 23, 2009, Dr. Okereke diagnosed stable diabetes and coagulopathy and prescribed medications. Tr. 486-488. The same day, an echocardiogram revealed concentric left ventricular hypertrophy; mitral valve prolapse; normal left ventricular systolic function and aortic valve; and mild mitral valve, tricuspid, and pulmonic insufficiency. Tr. 396-397. On March 6, 2099, Dr. Gonzalez noted that Plaintiff had some self-limiting nose bleeds. Tr. 515. He noted on March 20, 2009, that her pregnancy continued without problem and she was being closely monitored by the obstetrics department. Tr. 514.

On April 3, 2009, Dr. Anthony Gregg recommended that Plaintiff continue her pregnancy care at the University of South Carolina School of Medicine. Tr. 472-474. On April 17, 2009, Dr. Gonzalez switched Plaintiff's anticoagulant therapy from Heparin to Warfarin (she had entered the third trimester of her pregnancy). Tr. 513. On April 27, 2009, Dr. Okereke diagnosed Plaintiff with stable diabetes and prescribed medication. Tr. 489-494. An echocardiogram the same day showed mild aortic, pulmonic, mitral, and tricuspid valve insufficiencies, and mildly enlarged left atrium with left ventricular hypertrophy. Tr. 500. On April 28, 2009, Plaintiff began treatment with Dr. Kerry



Sims for diabetes management. Dr. Sims prescribed medications and diagnosed intrauterine pregnancy, insulin dependent diabetes, and chronic hypertension. Tr. 507-508.

On May 7, 2009, Dr. Gonzalez noted that Plaintiff was asymptomatic. Tr. 512. On July 20, 2009, Dr. Okereke diagnosed Plaintiff with, among other things, peripheral neuropathy, intermittent claudication (leg discomfort or pain), controlled hypertensive heart disease, controlled pulmonary hypertension, and stable diabetes. Tr. 560-562. The same day, bilateral lower extremity venous ultrasound and arterial duplex studies were normal. Tr. 576-577. On September 14, 2009, Plaintiff underwent successful primary low transverse caesarian section. Tr. 618-620.

On December 29, 2009, Plaintiff complained to Dr. Theo Mwamba about a lump under her right chest and skin rash. Dr. Mwamba diagnosed adenolipomatosis (deposits of adipose tissue) in Plaintiff's right chest, stable coagulopathy, hypertensive heart disease, mitral valve insufficiency, and controlled diabetes mellitus. Medications were prescribed. Tr. 563-565. An echocardiogram the same day showed mild mitral and tricuspid valve insufficiency, left ventricular hypertrophy, and normalized aortic root. Tr. 579-580.

On April 2, 2010, Dr. Gonzalez completed a "Medical Release/Physician's Statement" for the South Carolina Department of Social Services in which he opined that Plaintiff had a disability that was permanent. He opined that Plaintiff could only work part time for twenty hours per week; could only sit, stand, and walk a maximum of two hours each in an eight-hour workday; and could not lift or carry objects weighing more than ten pounds for more than one hour per day. He identified her disabling diagnosis as "[h]ypercoagulability related to a mechanical mitral valve replacement." Tr. 622-623.



On May 25, 2010, Plaintiff complained to Dr. Okereke of coughing and wheezing. Dr. Okereke noted that Plaintiff's electrocardiogram was abnormal and diagnosed asthma, pleurisy, stable coagulopathy, peripheral neuropathy, hypertensive heart disease, and mitral valve insufficiency. Medications were prescribed. Tr. 568-570. An echocardiogram that day showed mild left ventricular hypertrophy and "trace-to-mild" mitral valve insufficiency. Tr. 582-583. Plaintiff also underwent a chest CT angiogram study that showed post-median sternotomy changes, no pulmonary embolus, and no aortic dissection. Tr. 587.

On August 23, 2010, an exercise stress test indicated that Plaintiff achieved 86 percent of her age predicted heart rate, normal blood pressure, and no symptoms during exercise and recovery. She achieved 5.8 METs, limited by fatigue, and had an ejection fraction of 59 percent. Tr. 613-14. An echocardiogram the same day revealed that Plaintiff had concentric left ventricular hypertrophy, normal left ventricular systolic function, trivial mitral valve insufficiency, mild tricuspid insufficiency, and mild pulmonary hypertension. Tr. 615.

## **HEARING TESTIMONY**

Plaintiff testified she had a driver's license and drove about one hour (without stopping) to the hearing. Tr. 34. Plaintiff also testified that she drove once a week to the grocery store and to doctor's appointments. She stated that her doctors' appointments were approximately twenty miles from her home. She also stated that it took her fifteen to twenty minutes to drive to the grocery store. Tr. 35-36. Plaintiff testified that she dressed and tended to her personal needs without assistance, and she prepared meals at times. Tr. 36. She said she picked up her daughter, who weighed twenty pounds, at times. Tr. 38. Plaintiff estimated that she could sit for no more than one to two hours. Tr. 49.



**DISCUSSION**

Plaintiff alleges that the ALJ erred in failing to credit the opinion of her treating physician, Dr. Gonzalez. The Commissioner contends that the final decision that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence[1] and free of reversible legal error.

In particular, Plaintiff argues that the ALJ improperly attempted to undermine the statements of her treating specialist (hematologist Dr. Gonzalez) based upon diagnostic tests for impairments unrelated to her clotting disorder. She argues that Dr. Gonzalez limited her to a part-time job because of the risk of blood clots, but that the ALJ misread Dr. Gonzalez's reason and focused solely on Plaintiff's heart function and stress test. Additionally, Plaintiff argues that her treating cardiologist (Dr. Omoigui) concluded that managing Plaintiff's anticoagulation was a bit tricky and deferred treatment to Dr. Gonzalez. The Commissioner contends that Dr. Gonzalez's opinion was an administrative finding reserved to the Commissioner; his statement that Plaintiff could only sit, stand, and walk for two hours each was inconsistent with his own treatment records; his opinion was inconsistent with Plaintiff's self described activities of daily living; and his opinion was inconsistent with the medical evidence on the record as a whole including evidence from Dr. Okereke, Dr. Tribble, and objective testing.

---

[1]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

9



The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

Plaintiff argues that the ALJ erred in discounting Dr. Gonzalez's opinion because it was inconsistent with an exercise stress test in August 2010. She has, however, presented only her own opinion that the stress testing results had no relevance to the issue of hypercoagulability. Further, as argued by the Commissioner, even if this was an error, such error was harmless, as the ALJ

10



proffered numerous other reasons (as discussed below) for discounting Dr. Gonzalez's opinion that are supported by substantial evidence.

The ALJ's decision to discount the opinion of Dr. Gonzalez is supported by substantial evidence and correct under controlling law. He specifically gave only limited weight to Dr. Gonzalez's assessment because it was not supported by his own treatment notes, the results of Plaintiff's stress test, and Plaintiff's acknowledged level of functioning in her activities of daily living. Tr. 15. The ALJ also stated that he discounted this opinion because it is on issues reserved to the Commissioner; the opinion is not supported by the clinical findings, laboratory findings, observations, and Plaintiff's activities of daily living; and because Plaintiff had no joint swelling, myalgia, pain, or neurological deficits. Tr. 16. The ALJ properly discounted the opinion of Dr. Gonzalez as it is an issue reserved to the Commissioner and thus was not entitled to any special weight or significance. See 20 C.F.R. § 404.1527(d)(1); Castellano v. Secretary of Health and Human Servs., 26 F.3d 1027 (10th Cir. 1994).

Dr. Gonzalez's opinion is also inconsistent with his own treatment records. In September 2008, Dr. Gonzalez found that Plaintiff's prothombin time was therapeutic, she had regular heart sounds, and she had no extremity edema. Tr. 517-518. He noted that her pregnancy continued without any problems in March 2009. Tr. 514. In May 2009, Dr. Gonzalez noted that Plaintiff was asymptomatic. Tr. 512.

11



Dr. Gonzalez's opinion was also inconsistent with Plaintiff's activities of daily living.[2] In a November 2008 Function Report, Plaintiff reported that she prepared meals, spent time with her family, took care of her children, rode in cars, and shopped for groceries once a month. Tr. 211-219. At the hearing, she testified that she had a driver's license and drove about an hour (without stopping) to the hearing. Tr. 34. She also testified that she drove to the grocery store and to doctors' appointments, took care of her personal needs without assistance, prepared meals at times, and could pick up her twenty pound daughter. Tr. 35-36, 38. The ALJ noted that her physicians encouraged her to walk regularly. Tr. 15.

The ALJ's determination that Dr. Gonzalez's opinion was inconsistent with other medical evidence of record is also supported by substantial evidence. Objective testing supports the ALJ's decision. Echocardiogram studies, as outlined above, generally only showed mild valve insufficiency and normal left ventricular systolic function. A CT angiogram study in May 2010 showed no pulmonary embolus or aortic dissection. Tr. 587. Testing for blood clots (certainly relevant to the issue of hypercoagulability) also supports the ALJ's decision. Bilateral lower extremity venous ultrasound showed no evidence of deep venous thrombosis in October 2008. Tr. 377. Venous ultrasound and arterial duplex studies were normal in July 2009. Tr. 576-577.

The ALJ's decision is also supported by medical notes from other treating and examining physicians. As noted by the ALJ, none of Plaintiff's other physicians imposed any limitations on her activity. Tr. 15. Dr. Tribble noted excellent progress on September 15, 2008, and Plaintiff

---

[2]Contrary to Plaintiff's assertion, the ALJ noted activities to support his finding that, although Plaintiff was limited to a reduced range of sedentary work, she was not disabled from all work activity. He specifically noted she drove to the hearing, drove to the grocery store and doctors' appointments, took care of her personal needs, prepared meals, shopped for groceries, and had a one-year old daughter. See Tr. 15.



reported she was well at that time.  Tr. 392.  Although cardiologist Dr. Nowamagbe Omoigui (in a consultative report dated September 19, 2009 - Tr. 620) noted that managing Plaintiff's anticoagulation was a bit tricky and deferred treatment of this impairment to Dr. Gonzalez (who was already treating her for such), his comment was made only a few days after Plaintiff's caesarian section, at which time she was suffering complications from such including pelvic hematoma, anemia, and probable ongoing blood loss.  Dr. Okereke consistently described Plaintiff's coagulopathy as controlled, stable, or unchanged from September 2008 through May 2010.  See Tr. 337-341,  368-370, 374-376, 483-485, 486-488, 560-562, 568-570.  Dr. Mwamba described Plaintiff's coagulopathy as stable in December 2009.  Tr. 563-565.

## **CONCLUSION**

Based upon the foregoing, the undersigned concludes that ALJ's findings are supported by substantial evidence and correct under controlling law. It is, therefore, **ORDERED** that the Commissioner's decision is **AFFIRMED**.

                                                                        _____
                                                                        Joseph R. McCrorey
                                                                        United States Magistrate Judge

November 20, 2012
Columbia, South Carolina

13